IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| MIRIAM FLORES, individually and as parent of Miriam Flores, a minor child, et al., | Case No. CIV 92-596-TUC-RCC |
| Plaintiffs, | **ORDER** |
| vs. | |
| STATE OF ARIZONA, et al., | |
| Defendants. | |

On March 3, 2006, the Speaker of the Arizona House of Representatives and the President of the Arizona Senate requested Leave to Report to the Court the Adoption of House Bill 2064 ("HB 2064") (Docket No. 373) and Defendant State of Arizona filed a Motion to Expedite Consideration of State's Motion for Accelerated Consideration of Legislation (Docket Nos. 374 - 375). On March 8, 2006, the Court held a telephonic status hearing and requested the parties to brief the Court on HB 2064 to determine if HB 2064 satisfied both the December 2005 Court Order and the January 2000 Judgment in this matter.

On April 3, 2006, a hearing was held and the Court took the case under advisement. The Court considered the following memorandum and supporting documents: Defendant Thomas Horne's Memorandum in Support of the Act (Docket No.

1

414); Defendant State of Arizona's Opening Brief (Docket No. 415); Plaintiff Miriam Flores' Brief Regarding Sufficiency of House Bill 2064 (Docket No. 419); Amicus Arizona School Boards Association's Brief *Amicus Curiae* Brief (Docket No. 425); Amicus House and Senate Democratic Caucuses of the Arizona Legislature's Brief (Docket No. 427); Plaintiff Miriam Flores' Brief (Docket No. 428); and Intervenor Parties Speaker of the House/President of the Senate's Brief Replying to Opening Briefs of Plaintiffs and Attorney General (Docket Nos. 422 and 434). As a result, this Court held that HB 2064 did not satisfy the January 2000 Order and Judgment ("January 2000 Order") or the December 2005 Order and denied the Intervenor's Motion to Purge Contempt, Dissolve Injunctions, Declare Orders Satisfied, and Set Aside Injunctions.

On April 25, 2006, the Court entered an order holding that HB 2064 did not bear a rational relationship to the cost of providing ELL Programs, as required by this Court's January 2000 Order. The Court's April 2006 Order (Docket No. 448) was based on the following identified problems with the new law:

1. The Act does not comply with the Court's original Judgments and Orders.
2. On its face, the Act does not appropriately fund the ELL program.
3. The Act fails to delineate the cost of providing a viable ELL program.
4. The Act does not explain the basis for the $77 increase for Group B weight students or how the $432 appropriation is rationally related to the ELL program.
5. The $432 appropriation is more than current funding, however it is less than the amount that was discredited in a "cost study" that was done more than eighteen years ago, and less than the amount that was determined by the now "discredited cost study" held two years ago.

6. Based on the Act, there is no way to determine if the models are indeed standards for school districts and charter schools to follow.

7. The two-year limitation is a violation of federal law. And,

8. The offsets of federal funds such as Title I, IIA, III, Impact aid and desegregation monies also violate federal law.

On July 31, 2006, the Ninth Circuit Court of Appeals reversed this Court's Orders holding the Moving Defendant's in contempt and rejecting House Bill 2064 ("H.B. 2064") and remanded to the District Court with instructions to hold an evidentiary hearing and make findings of fact regarding whether "changed circumstances" required modification of the original court order pursuant to Rule 60(b)(5). The Court held an eight day evidentiary hearing, beginning on January 9, 2007. The parties presented live testimony and stipulated to admit into evidence most exhibits. The trial addressed only one specific issue. The following issue was tried: whether funding and programmatic changes that have occurred since the January 2000 Order in this case warrant a modification of that judgment or otherwise bear on the appropriate remedy in this case. The Court has considered all the testimony and exhibits, the briefs filed before and after the hearing as well as the findings of fact and conclusions of law by all parties.

This Court's Order will be as brief as possible as the Court promised the parties a speedy ruling so that the State Legislators could take action before its scheduled adjournment if needed. It is the contention of the Superintendent and the Legislative Intervenors that the Court's January 2000 Order has been satisfied. Specifically, the moving Defendants state that "changed circumstances" in the Nogales Unified School District ("NUSD") has satisfied the original January 2000 Order and obligates the Court to at least modify or vacate that original order. The moving Defendants put forth what

1  they contend to be the "stellar" successes of NUSD and supposedly great strides taken by
2  the State to comply with the Court's Order.
3        There is no doubt that NUSD is doing substantially better that it was in 2000. The
4  State's superintendent of schools is doing better than it was in 2000 with regards to its
5  role in making sure that children receive quality education. The Arizona Department of
6  Education ("A.D.E.") is doing much more than it was in 2000, with regard to creating
7  standards, norms and oversight for Arizona's public schools and students with regard to
8  ELL programs. It is apparent that the A.D.E. has taken its role seriously and is
9  endeavoring to establish appropriate standards and goals for all students in Arizona. It
10 should be noted that it would be premature to make an assessment of some of these
11 changes. Indeed, many of the new standards are still evolving. Unfortunately, the
12 moving State Defendants and Legislative Interveners are not doing better as it pertains to
13 satisfying the original Court Order.
14       The strides made by NUSD have been made largely as a result of their efforts
15 alone. The State Superintendent and State Legislators sing the praises of Mr. Kelt
16 Cooper – he was called Super Cooper due to his efforts in the NUSD – and his noted
17 achievements during his tenure as Superintendent for NUSD however, he is but one
18 person and is no longer employed by NUSD. The success or failure of the children of
19 NUSD or any other School district should not depend on having a "Super Cooper" at the
20 helm. The State must establish clear rules and requirements that can be fulfilled and
21 followed, no matter who is in charge.
22       Several claims were made suggesting that NUSD is doing well, however NUSD's
23 success is fleeting at best, particularly as it pertains to NUSD's high school students. It is
24 great that children in elementary and middle school are doing better however, that is not
25

sufficient. Success must also include the high school students of NUSD. Currently, this is not being accomplished.

All parties agree that learning English doesn't take place in a vacuum. Also, all parties agree that it takes a number of resources and often more than two years to achieve success in any ELL program. Plaintiffs argue that the impetus for success in NUSD was greatly attributed to the raising of their ELL program costs, which were $1,570.00 more than the base level funding normally provided by the State. The moving Defendants argue that the successes at NUSD qualify as "changed circumstances" and ask the Court to lift its sanctions. However, NUSD's changed circumstances had little or nothing to do with any help from the moving Defendants themselves.

By increasing the standards of accountability, the Federal No Child Left Behind Act ("NCLB") has to some extent significantly changed State educators approach to educating students in Arizona. In order to receive funding, NCLB requires certain adequate yearly progress to be made by each public and charter school. NCLB also requires States to create and accountability system of assessments so that public schools can continually receive funding. NCLB also reaffirms the requirement of the State to effectively educate non-English speaking students.

Just as the State has to consider all school districts when coming up with funds for a single district like NUSD, it is impossible to limit the effects of the judgment and the Court's Order to NUSD. While the Court has heard testimony regarding the cost of programs other than the programs at NUSD, the Court findings are based upon the evidence of what exists in NUSD except where specifically stated otherwise.

The parties are aware that this Court analyzed HB 2064 last spring and does so again here for the purpose of determining whether or not the Court's January 2000 Order has been satisfied. It should be noted that the Court finds the same problems today that it

saw last year, because HB 2064 is the same, the problems themselves are the same. The parties are to refer back to the April 2006 Order (Docket No. 448) for the Court's reasoning.

The Court having heard the testimony and having examined the evidence offered by the parties, and having heard the arguments of counsel and being fully advised herein, the Court now finds generally in favor of Plaintiffs and against Defendants, and hereby makes the following special Findings of Fact and Conclusions of Law pursuant to Federal Rules of Procedure, Rule 52(a) and (c) as well as Rule 60(b)(5) which constitutes the decision of the Court herein:

**FINDINGS OF FACT**

To the extent these Findings of Fact are also deemed to be conclusions of law, they are hereby incorporated into the Conclusions of Law that follow.

1. At the time of this Court's judgment in January 2000, the State funded ELL instruction by adding a per-student amount (the "Group B weight") for every ELL student in a school district or charter school to the amount of per-student funding provided for English proficient students.

2. Since 2000, the State has changed its primary model of ELL instruction from bilingual education to structured English immersion.

3. The State has also increased generally available funding for schools programs, facilities, and teachers. It has also used federal grant money to provide for additional, short-term assistance with reading instruction to some at-risk schools, including four in the Nogales Unified School District ("NUSD").

4. ELL students need extra help and that costs extra money. (Tr. 1/8/07 at 101.) The process for funding ELL instruction in the State now and for the foreseeable future, absent some further legislative enactment, is controlled by HB 2064, which attempts to meet the requirement of the EEOA by calculating and funding the

"incremental costs" of ELL instruction, which are statutorily defined as "costs that are associated with a Structured English Immersion program pursuant to section 15-752 or a program pursuant to section 15-753 and that are in addition to the normal costs of conducting programs for English proficient students." A.R.S. § 125-756.01(L)(2).

5. HB 2064 adds an additional sum to the Group B weight, which, if it were currently effective would raise funding per ELL student from approximately $365 to approximately $444. (Tr. 1/17/07 at 67-68.) This additional sum will not be provided unless and until this Court issues an order approving HB 2064 as a response to this Court's January 2000 judgment, which it has not done. (HB 2064 § 14.)

6. Beginning in the 2007-08 school year, HB 2064 institutes a system of cost-based funding using instructional models to be developed by a task force. A.R.S. § 15-756.01(C).

7. Under the new law, school districts and charter schools will choose from among the approved instructional models, A.R.S. § 15-756.02, and calculate the incremental cost of implementing that model in their district or school, A.R.S. § 15-756.01(H).

8. Depending on the amount of the incremental cost of the chosen instructional model, a school district or charter school may be able to request additional funds to cover that cost from the Structured English Immersion ("SEI") Fund. A.R.S. § 15-756.01(I).

9. The amount of the allowable SEI Fund request is limited. (*Id.*) Before requesting funds, districts and schools must deduct from the calculated incremental cost (1) the Group B weight, (2) all federal Title III monies they receive, (3) a proportionate share of the federal Title I and II A monies they receive, (4) a proportionate share of the federal impact aid monies they receive, and (5) a proportionate share of their desegregation funds. (*Id.*) Only if they still have unmet incremental costs after applying

all of those funding sources may they request monies from the SEI Fund, and only in that limited amount.

10. The Plaintiffs presented evidence that the per-student incremental cost of providing ELL instruction is greater than either the current Group B weight of $365 or the increased weight of $444 that would be provided if this Court approved HB 2064, both in NUSD and in other districts. (Exs. 7, 9, 10, 14; Tr. 1/18/07 at 59-60; Tr.1/24/07 at 117, 131; Tr. 1/25/07 at 15-16; Tr. 1/25/07 at 148, 156.) Therefore, the SEI Fund provisions of A.R.S. § 15-756.01(I) will govern the total amount of funding received by NUSD and other districts and schools to educate their ELL students.

11. Federal funds available under the Title I, IIA, and III programs are designed to provide additional educational resources for at-risk students, not to subsidize any obligation the state may have to educate those students. (Tr. 1/9/07 at 12.) Grants of federal funds therefore carry a restriction on "supplanting," or the substitution of federal funds for the funds a state would otherwise have spent on a program in the absence of the federal funds.

12. The amount of federal funds Arizona received or expects to receive under the No Child Left Behind Act totals $575,714,495 and $582,931,537 for fiscal years 2006 and 2007, respectively. (Tr. 1/9/07 at 173 & Ex. 305.) The largest portions of these funds are for Title I programs in the amounts of approximately $289,000,000 and $295,000,000 for fiscal years 2006 and 2007, respectively. (*Id.*) The supplement not supplant restriction goes to the core purpose of Title I, which is to make certain that children in high poverty schools [receive] extra services. (Tr. 1/9/07 at 166.)

13. The State agrees, in writing, to comply with this restriction on supplanting as a condition of receiving federal funds. (Ex. 300.) It also agrees to ensure that any school districts to which it provides subgrants will also refrain from supplanting. (*Id.*) To that end, the State requires districts receiving federal funds to sign an agreement that

they will not use federal funds to supplant state educational funds. (*See, e.g.,* Tr. 1/25/07 at 72-73.)

14. A state found to have used federal funds to supplant state educational expenditures faces the prospect of being required to return the misused funds and may lose future eligibility for federal funds under those programs for all students. (Tr. 1/9/07 at 174-75, 183.) In Arizona, the potential loss of federal funds is substantial, as the State receives approximately $600 million per year. (*Id.* at 183.)

15. Thomas Fagan, a 29-year veteran of the United States Department of Education and an expert on Title I funding testified, referring to HB 2064, that he had "never seen such a blatant violation" of supplement not supplant restrictions. (Tr. 1/9/07 at 162-64 & 186.)

16. HB 2064 also imposes a time limit on funding available to school districts and charter schools for the education of their ELL students. After a student has been classified as an ELL for more than two years, funding for English language instruction provided to that student is cut off. A.R.S. § 15-756.04(C). The district or school will continue to receive base level funding for the student, just as it receives for English proficient students, but it will not receive either the ELL Group B weight or any [additional monetary support] from the SEI fund to meet the incremental cost of providing structured English immersion instruction to that student. *Id.*

17. The district or school may still receive compensatory instruction funds for students who do not reach English proficiency within two years, but those funds are not guaranteed or formula-based, and the statute permits compensatory instruction funds to be used only for services apart from normal classroom instruction. A.R.S. § 15-756.04(C), § 15-756.11(G). (*See also* Tr. 1/11/07 at 132.) Under HB 2010, the predecessor to HB 2064, compensatory instruction funds could be used to improve academic proficiency and English language proficiency. (Tr. 1/10/07 at 130-31.) HB

9

2064 limits the use of compensatory instruction funds to improving English language proficiency. (*Id.*)

18. Because of the two-year cutoff, districts and schools will have to bear the incremental costs of normal classroom instruction for ELL students who take longer than two years to attain English proficiency. Alternatively, they will have to dilute their remaining Group B weight funds to cover these students as well. In NUSD that would effectively reduce the district's Group B weight funds from $365 to $182. (Tr. 1/17/07 at 68.)

19. HB 2064 also limits the availability of C.I.F. for reclassified English proficient students to only the first two years after they are reclassified. A.R.S. § 15-756.11(G). The use of compensatory instruction funds is limited to improving English language proficiency even though reclassified students are, by definition, proficient in English. (Tr. 1/11/07 at 134-35.)

20. No distributions have been made from the $10,000,000 compensatory instruction fund created by HB 2064. On a per ELL student basis, the fund provides $74 per student. (Tr. 1/17/07 at 69-70.)

21. Many students may attain English language proficiency within two years, but two years of ELL instruction is insufficient for many English Language Learners.

22. On average, it takes ELL students in the NUSD four to five years to be reclassified as English proficient. (Tr. 1/18/07 at 17-18; *see also id.* at 40.) Tucson Unified School District ELLs spend an average of 4.6 years in ELL programs. (Tr. 1/24/97 at 204.) In the Murphy Elementary School District, 86% of exited students took more than two years to achieve English language proficiency. (Tr. 1/25/07 at 163-64, 168-70, 172-73; Ex. 16.) Proficiency within two years is the exception in the Scottsdale Unified School District. (C. Rivera Depo. at 67.) And in the Glendale Union High School District, 46% of the ELL students in Glendale High School and 15% of those at

Sunnyslope High School take more than two years to achieve English language proficiency. (Docket Entry 614, Plaintiffs Notice of Filing Exhibit)

23. The Defendant-Intervenors and the Defendant Superintendent of Public Instruction (collectively, the Moving Parties) did not present any evidence that two years is a sufficient amount of time for all ELL students to attain English language proficiency.

24. The State does not currently have data as to the statewide average for how long students are classified as ELLs before they exit the system. (Tr. 1/11/07 at 112.)

25. Those of the Moving Parties' witnesses who addressed the subject were unanimous in their opinion that at least some students will not reach English language proficiency in two years.

26. The Moving Parties' expert, Rosalie Porter, testified that achieving English language proficiency takes approximately two years, but "some children will certainly require more time." (Tr. 1/8/07 at 110 & 128.) She also testified that services and funding for those children should not be cut off. (*Id.* at 127.)

27. Irene Moreno, who is in charge of the English Acquisition Services section of the Arizona Department of Education testified that people "that have been in the system" believe students become proficient in English "generally anywhere from two to three years." (Tr. 1/10/07 3 at 11.) She also testified that the one model for ELL instruction developed by her group "allows for the possibility that students are going to take longer than two years." (*Id.* at 103.)

28. The former superintendent of NUSD, Kelt Cooper, testified that he "would think that within three years a bright young person with a great deal of support could probably be pretty good at a second language, but I'm comfortable with three years being fairly strong." (Tr. 1/11/07 at 85.) He was not comfortable with a one or two year time period. (*Id.* at 107.)

11

**CONCLUSIONS OF LAW**

1. To the extent any of these Conclusions of Law contain findings of fact, they are hereby incorporated into the Findings of Fact above.

2. The [Federal] Equal Educational Opportunities Act ("EEOA") requires the State "to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs." 20 U.S.C. § 1703(f).

3. In order to satisfy the mandate of the EEOA, the State may choose any legitimate established or experimental instructional method; the Court will not interfere with the State's choice from among legitimate available models of language instruction. *See Castaneda v. Pickard*, 648 F.2d 989, 1009 (5th Cir. 1981).

4. Once the State has chosen an instructional method, it must provide sufficient funding to implement that method. *Id.*

5. It is in this regard that this Court found the State's actions deficient under the EEOA in its January 2000 judgment. The Court found that the State had not adequately funded ELL programs in the Nogales Unified School District, as demonstrated by inadequate resources available to educate ELL students in that district, and that the State had failed to fund ELL programs in a manner rationally related to the cost of providing the State's chosen instructional model.

6. While this Court's January 2000 findings of fact and conclusions of law identified certain specific areas in which the NUSD ELL educational program was lacking, such as classroom size and materials, mere amelioration of those specific conditions is inadequate to comply with this Court's judgment and subsequent orders. Rather, compliance would require a funding system that rationally relates funding available to the actual costs of all elements of ELL instruction.

7. The Intervenor Defendants, joined on remand in this argument by the Superintendent, contend that there has been a sufficient change in the underlying factual

12

circumstances that justifies setting aside this Court's 2000 judgment as satisfied and ending judicial supervision over this case.

8. The movants' burden is defined by the procedural rule under which they seek relief – Federal Rule of Civil Procedure 60(b)(5). That rule provides that relief from a judgment may be had if "the judgment has been satisfied, released, or discharged, reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application."

9. Rule 60(b)(5) provides relief from final judgments where a "significant change in facts or law warrants revision of the decree." *Bellevue Manor Assocs. v. U.S.*, 165 F.3d 1249, 1255 (9th Cir. 1999) (quoting *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992)). There must be a showing that "it is no longer equitable that the judgment should have prospective application, not when it is no longer convenient to live with [its] terms." *Rufo*, 502 U.S. at 383); *see also Agostini v. Felton*, 521 U.S. 203, 257 (1997) (Ginsburg, J. dissenting) ("[R]eligitation of the legal or factual claims underlying the original judgment is not permitted in a Rule 60(b) motion or an appeal therefrom.").

10. To prevail on a Rule 60(b)(5) motion, the movant must "satisfy the initial burden of showing a significant change either in factual conditions or in the law warranting modification of the decree." *U.S. v. Asarco, Inc.*, 430 F.3d 972, 979 (9th Cir. 2005) (citing *Rufo*, 502 U.S. at 384). If the movant meets that burden, it must show that its proposed modification of the decree is "suitably tailored to resolve the problems created by the changed factual or legal conditions." *Id.* (citing *Rufo* at 391.)

11. A movant who cites significantly changed factual conditions "must additionally show that the changed conditions make compliance with the consent decree 'more onerous,' 'unworkable,' or 'detrimental to the public interest.'" *Id.* (citing *Small v. Hunt*, 98 F.3d 789, 785 (4th Cir. 1996) and *Rufo* at 384).

12. The movants in this case have attempted to demonstrate that the judgment has been satisfied, relying both on (1) evidence about new methods and funding sources in

place now that did not exist in the State in 2000 and (2) HB 2064 as a funding method that satisfies the legal requirement that funding be rationally related to the actual cost of ELL programs. In such cases, the Court must evaluate whether changes in the defendants' activities are "so significant as to warrant an end of court supervision." *See Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000). While an extended period of voluntary compliance is "a factor supporting termination of an injunction . . . more is required." *S.E.C. v. Coldicutt*, 258 F.3d 939, 943 (9th Cir. 2001).

13. HB 2064, which currently controls ELL instructional funding violates federal law.

14. HB 2064 takes into consideration federal funds received under the Elementary and Secondary Education Act ("ESEA"), in violation of 20 U.S.C. § 7902. A.R.S. § 15-761.01 determines the amount of funding available to districts and schools to fund the incremental costs of educating ELL students in a calculation that depends on the amount of ESEA funds that district or school has received. This is absolutely forbidden under federal law and this Court therefore cannot approve HB 2064's funding system.

15. Because HB 2064 attempts to meet the State's obligation to fund ELL instruction with federal funds that cannot be so used, it does not comply with the EEOA. HB 2064 does not provide for full State funding of ELL instructional costs. Rather, it subtracts a proportionate share of the federal funds received by a district or school from the amount that that district or school will receive. A.R.S. § 15-756.01(I).

16. The federal laws governing use of the Title I, IIA, and III funds at issue expressly forbid the State from using those funds to "supplant," or replace, funds that the State would otherwise provide. 20 U.S.C. § 6314(a)(2)(B) (Title I funds for schoolwide programs); § 6315(b)(3) (Title I funds for targeted programs); § 6613(f) (Title IIA grants to states); § 6623(b) (Title IIA subgrants to local educational authorities); § 6825(g) (Title III funds). HB 2064 violates these supplement not supplant restrictions. Therefore, a district or school whose incremental costs exceed the Group B weight provided to all

schools will face the choice of violating federal laws governing the use of their federal funds, thereby jeopardizing both those funds and eligibility for future federal funds, or underfunding its ELL instructional programs. Neither scenario represents compliance with the EEOA.

17. These violations of federal law jeopardize the entire stream of federal educational funds available to the State's students, a sum of almost $600 million per year. Withdrawal of eligibility for those funds, or an order that the State repay them in whole or part, would have serious detrimental consequences for all Arizona students, including ELL students.

18. HB 2064 imposes an impermissible two-year limitation on funding for ELL instruction, cutting off all funding for the incremental cost of ELL classroom instruction, including the Group B weight. The EEOA does not permit time limits or restrict the State's obligation to ELL students to two years. The evidence showed that some ELL students need more than two years to become proficient in English. As a result, HB 2064 fails to fund each year of ELL instruction necessary to attain proficiency.

19. For all these reasons, the funding mechanism put in place by HB 2064 fails to comply with the EEOA. HB 2064 fails to satisfy this Court's judgment because it does not provide funding for ELL instruction, for all ELL students, that is rationally related to the cost of that instruction. Instead, it systematically underfunds ELL instruction by impermissibly considering and deducting federal funding amounts that cannot be used for those purposes and by imposing a two-year limitation on the funding available for any student.

20. Rule 60(b)(5) relief is only available under limited circumstances where the moving party can establish (1) a significant change in the facts or the law warrants revision of the decree, (2) changes in the defendants' activities are so significant as to warrant an end of court supervision, (3) changed conditions make compliance with the consent decree more onerous, unworkable, or detrimental to the public interest, and (4)

the moving party's proposed modification of the court's decree is suitably tailored to resolve the problems created by the changed factual or legal conditions. The Moving Parties failed to satisfy any of these prerequisites to Rule 60(b)(5) relief.

**CONCLUSION**

On January 24, 2000, this Court held that the State's minimum funding level for ELL programs was arbitrary and capricious and bore no rational relation to the actual funding needed to insure that ELL students could achieve mastery of the State's academic standards. *See Flores v. State of Arizona*, 172 F. Supp. 2d 1225 (D. Ariz. 2000). More than 7 years later, circumstances in this regard remain the same. The Moving Parties have not shown compliance with this Court's decree, much less changed circumstances that would warrant modification or dissolution of this Court's order. Accordingly,

**IT IS HEREBY ORDERED** that the Court finds in Favor of the Plaintiffs.

**FURTHER, IT IS ORDERED** that the Court finds that the moving Defendants failed to satisfy the requirements pursuant to Rule 60(b)(5) for relief.

**FURTHER, IT IS ORDERED** that the State has until the end of the current Legislative Session to comply with the Original Order.

Dated this 22nd day of March, 2007.

Raner C. Collins
United States District Judge